Good morning, Your Honors. May it please the Court, my name is Scott Wolkitz and I represent the Nuveen appellates in this case. It is my intention to reserve seven minutes of my time for rebuttal. All right. Nuveen's appeal in this case raises two primary issues. First, that the trial court erred when it concluded that Alameda was categorically immune from Nuveen's State Statutory Securities Act claims. Second, that the trial court imposed an incorrect loss causation standard that Nuveen could not possibly meet to Nuveen's Federal securities claims. Nuveen requests that in this case the court reverse the trial court's order on both those grounds, reinstate Nuveen's State and Federal securities claims, and remand to the trial court for further proceedings. Okay. There is a cross appeal in this case. It is our belief that the cross appeal is adequately briefed. If the court has questions or if it's necessary in rebuttal, we will address it at that point. But unless that occurs, we'll reserve and focus our argument on the other issues. I'll start today with the immunity issue. California courts look at the existence of immunity first by determining whether there is a statutory duty for which the entity may be held liable, and if there is, then determining if immunity exists for the entity. Can I just jump in to 818.8? Yes. So is there any case that you've got that's interpreted in the way you want us to interpret it? Your Honor, I know because there's no case that directly addresses the California Securities Act. But I think if you look at the companion cases of Caldwell and DeJonge, they provide instructive guidance. Caldwell was looking at an entity, a situation involving strictly derivative liability where they were looking at the individual board members. And when you're looking at Caldwell, you have that situation of except otherwise provided. Well, Caldwell said when you're looking at a statute like the California Securities Act, in that case FEHA, FEHA did not have an intention to hold employees of public entities otherwise liable in addition or over top of statutory immunity. But then DeJonge came along and said same statute, FEHA, did express an intention to hold the entity directly liable because it went in and expressly defined the public employer. I know. But that immunity statute there had that except as otherwise provided by statute language, which 818.8 does not. Your Honor, I think the key is recognizing Alameda's argument is focused on a conception that the only way that an entity can be liable for a violation or misrepresentation is derivatively. And that conception is the incorrect issue. In California law, and it was ZILIG, recognized that entities can have both direct and derivative liability. That same structure is repeated in the Tort Claims Act. 815 addresses itself to direct liability by saying we are going to abolish direct liability unless there is a statutory enactment that recreates it. 815.2 is what defines the circumstances under which an entity may be derivatively liable. Now my question is, we do have the only cases that we have from California seem to, in my view, go against you. Your position relies more on the plain meaning of the statute to some degree. Is this an issue, or do you have any position on whether this issue should be certified to the California Supreme Court? Your Honor, that's an interesting question. It's obviously something that would be an option for the Court, because it is an operator or an issue that directly affects the California statutes. Having said that, I don't believe it's necessary, because as Your Honor pointed out, I do believe it's an issue of statutory interpretation. And when you look, we talked about the distinction between derivative and direct liability, and I think you can really, you can really ascertain the difference by comparing 818.8 to other statutes in that same range to see what the different language was that the legislature used. So one example is 818.4, which was dealt with in O'Hagan. 818.4 was an absolute immunity for licensing actions. If you read 818.4, it doesn't say that the entity is immune from licensing decisions made by its employees. It simply says the entity is immune from licensing decisions. If 818.8 was intended to isolate Alameda from liability for both direct and derivative claims, 818.8 should be read and stated similarly to 818.4. But it's not. It has an express statement in the statute that says that entities are only immune from claims that arise out of misrepresentations of their employees. So the only way to read that in a manner that is consistent with the rest of the statute is to say that 818.8 applies only to derivative liability. If we apply it to blanket immunity, as Alameda suggests, we are rendering this portion of the statute that says it applies only to claims for misrepresentation arising out of employee misrepresentations inoperative. Sotomayor, I take it then that there is no California case that actually rejects public entities' assertion that its own misrepresentations are protected under 818.8. No, Your Honor. We are we have reviewed all the cases cited by the parties in their briefs, and there is not a case that we read as directly considering the argument we are making in that case. There is derivative and there is direct liability, and 818.8 only goes to derivative liability. Counsel. Yes, Your Honor. What do you make, then, of the commentary to 818.8 that provides in part that this section provides public entities with an absolute immunity from liability for negligent or intentional representation? It conflates employees and entities. Your Honor, my first comment in response to that would be that you have to read the comment as a whole, not just in part. And the very next section actually supports our interpretation, where it says that the entity is immune from misrepresentations by the employees. But beyond that, Your Honor But entities can speak only through its employees, right? And, Your Honor, that as a functional matter is true, but if that meant that entity liability was only derivative, then we wouldn't have ZLIG saying that there is also the existence of direct liability as supported by statute, and we wouldn't have a Tort Claims Act that specifically distinguishes between direct liability in 815 and derivative liability in 815 too. But further to Your Honor's point, if we were you're asking about the comments to the section, we would contend, Your Honor, that you only get into consideration of comments if a statute is unclear on its face. And if we apply to that before we move to certify it, to maybe look at the comments to the California Supreme Court? Can you review the comments? Obviously, we can, but that would be an intermediate step, wouldn't it, before we went to the California Supreme Court? So maybe we do that instead of considering certifying the question to the California Supreme Court. Your Honor, you certainly have it within your purview to look at the comments, but I think in order to do that, you would have to conclude that the statute was otherwise unclear based on its face, because that is the only circumstance in which you even get to extrinsic evidence like the comments. And if you read the statute, and specifically if you read it in connection with ZLIG and the scheme, if you read 815 clear through 820 and you read the statutory scheme, which is intended to both define and indicate the situations in which direct and derivative liability exist, Your Honor, I don't believe you ever get to the comments. If we read the statutory scheme, though, isn't the statutory scheme at its core one that insulates these public entities from liability? Your Honor, the statutory scheme, it does, but I think more specifically, it defines the circumstances under which a public entity may be held liable. Is it like an ad jusem generis statute that specifically articulates the type of behavior it's trying to control? Is that what it's like? Your Honor, I would not say that the TORC claim statute by itself specifically articulates the type of behaviors it's intended to control, because there are numerous references throughout the statute to other statutory enactments that create liability. And that is, I think, what we would distinguish between direct and derivative. We would concede, Your Honor, that 818.8 insulates Alameda from derivative liability claims. That's fairly clear. The question then becomes, what do we do with the direct liability claims that exist under the California Securities Act against Alameda? And that's not dealt with by 818.8. We have to deal with those direct claims under 815. And 815 states that the statutory immunity, excuse me, entity immunity is abolished except as otherwise provided by statute. Now, Alameda in this case claims that, quote, no part of the CSL specifically declares public entities to be liable for securities fraud. That's just not true. If you read the California Securities Act, it says that an entity that, excuse me, it uses the word person. That's the key. A person who violates the provisions of the act is liable to the purchaser. Well, the California Securities Act specifically defines. Exactly, Your Honor. Well, I mean, the closest analogs we really have are, I suppose, looking at the waiver of sovereign immunity in the Federal context. And there are – there certainly are cases where the government might come under definitions of, say, persons and others where it's not. But then often the Supreme Court says, but you really need kind of a knock-you-over-the-head waiver. So in this case, we have a definitional inclusion, but you don't have a real kind of knock-you-over-the-head waiver. So where does that leave us? Your Honor, I would caution reliance on Federal tort claim interpretation, because the Federal tort claim statute defining immunity is different than the State statute. And I'm not speaking just to the Federal tort claims, but to other circumstances where the courts have looked at Federal government immunity to try to decide when is something definitional and when is it – you know, what do you need to have a waiver? Your Honor, I understand the tendency to look at Federal law, and I do think that in some circumstances it can be persuasive, but I think the more powerful statement here is made by taking a look at Caldwell and DeJonge, because those are cases directly interpreting both the California Tort Claims Act and the existence of an otherwise established cause of action, specifically DeJonge. DeJonge says that that kind of definitional creation of liability is sufficient to create a direct cause of action. That one was under FEHA against the entity. I think that the principle in DeJonge is directly applicable here and applies to create a direct cause of action. But when you look back at 815, which is what you directed me to look at, and again, when you look at the commentary, that says that the immunity provisions will, as a general rule, prevail over all sections imposing liability. So doesn't that take us back to where we were in 818? No, Your Honor, and the reason it doesn't is because 815 has that except as otherwise provided. Your Honor, I think we readily concede that 818.8 does apply to bar derivative liability. It is a specific statute that addresses derivative liability without exceptions. Our claims are not derivative in nature. Alameda was the issuer of the debt. People don't issue debt. Our claims are direct claims against Alameda. And 815 does have an exception where the claim otherwise is provided by statute. And the California Securities Act, consistent with the analysis in DeJonge, provides exactly that claim. Can we move you to loss causation before you run out of time? Absolutely. So I – let me just tell you. I accept the premise of your argument that if the district court in fact held you to the standard that applies in efficient market cases, there's no way you could meet that. So there's got to be some alternative. But I thought on page 12 of the ruling, the summary judgment ruling, that the court said that, look, I agree with you that you can't come up with a traditional event study, but you could have tried to show the – basically the fraud premium that existed. And so she sort of suggested that there were these alternatives, but your expert – she was referring to Sosa – just never provided any other explanation. So can you just directly address that point? Yes, Your Honor. The trial court's order, I do recognize that she, I believe, admitted that we could not meet that kind of traditional event study test. But if you go to a latter point in the order, and I don't have the citation in front of me, but she specifically says that the arguments we present are persuasive. However, Oracle is controlling and we pointed to no law that contradicts Oracle. Now, Oracle is – and this is the fundamental problem. It's not the event study per se, because the event study is a way of proving the drop in price following disclosure methodology. It's the drop in price following disclosure methodology that is the real issue with this case. Right. Because I take it that you're – just one quick question. I take it that the exact same problem would exist even if the market for these notes had been efficient, right? You know, possibly, Your Honor. And, you know, the issue – the issue that comes up with an instrument such as this one is that the disclosure is not as certain as it is in the equities market. So you have the individuals who are in charge of making disclosure who are identical as the ones who committed the fraud. So – No, but I guess – let me just be clear. I'm sorry. In a case where there is no disclosure, that model can't apply, right? That's correct. And that's your case. That's correct, Your Honor. That is absolutely correct. Okay. So what – what's the alternative that we're supposed to tell the district court to apply on remand? Your Honor, if we strip away all the efficient market cases and everything that came out of that, all we're left with is Dura. And if you look at Dura, which itself recognized it was an efficient market case, but the underpinning of Dura is that loss causation may be proved by showing proximate cause. Now, proximate cause is a standard that we're – you know, we're well familiar with, Ninth Circuit, California as well. Proximate cause only requires a showing that the plaintiff's loss is the reasonably foreseeable result or consequence of the defendant's actions. That is the generalized standard. The specific standard that's applied in equity cases, that is a method, one method, of showing proximate cause. But it is not the absolute and only method. And so what we would urge the court to do on remand is tell the trial court that the correct standard is a generalized proximate cause standard. But, you know, we're here on summary judgment, right? Yes, Your Honor. So we can affirm on any ground. And your evidence is there. I mean, I look at Dura, and I read it a little bit differently, perhaps, than you. I mean, I think Dura is basically saying you can't just throw out stock price, drop, voila, we're done, because, basically, you have to show the reason – you have to show the proximate connection, and you have to show a reason. And there may be multiple other reasons that there's a stock drop. And that's why all these cases where people rushed in the day the stock dropped, you know, got tossed. So your answer to say, well, it's just proximate cause, doesn't really answer the question of what in the record is the causation, because whether you call it proximate cause or lost causation light because you have an inefficient market, you're still stuck with the same basic question. Your Honor, this – it's the specific nature of the instrument that answers that question. This is a secured debt obligation. And our allegations, and we believe the evidence that we've presented, are sufficient to show that when Alameda issued this debt obligation, it knew that it could not be repaid or refinanced. The key allegation was that these notes were intended to be refinanced. To be refinanced, they had to demonstrate positive net income by at least 2008. Information in Alameda's own possession indicates that they themselves projected it at that point in time, which means they knew it would fail. Now, because of the nature of this being a secured debt obligation, if you know that a secured debt obligation will not be repaid, then it is reasonably foreseeable to you that if you go ahead and issue that obligation anyway, then the purchaser of that obligation is going to be harmed, and the harm is going to be measured in the amount of the difference between the purchase price and whatever the purchaser is able to realize on the collateral for that note. The harm may occur immediately. It may occur sometime down the road. But you know that is the harm you have subjected the purchaser to. In the record we have expert testimony that suggests that Alameda knew they were issuing a bad note, knew it was going to default, and that it couldn't have been marketed. Based upon that testimony, a jury could reasonably conclude that Alameda could foresee  the consequence of their actions, Nuveen would be damaged in the amount of the difference between its purchase price and what it realized on the collateral. The trial court focused on Sosa. Frankly, under a correct proximate cause standard, we don't believe his testimony is necessary at all. Roberts. One quick question before we sit down. Are the misrepresentations that you are alleging as the basis for your claim, do they end up being the reasons for the default? Do you know what I mean? Yes. The misrepresentation concealed the fact that the bonds were due to doom, they were going to fail. Because the projections were – if the true projections had been known, it was clear that they were never going to be able to refinance in whatever that year was. Correct. Okay. May it please the Court. My name is Gregory Aker. I'm here today as counsel for the City of Alameda. The district court in this case granted summary judgment. We believe it did so properly based on two grounds. Number one, it found that Nuveen had not established the essential element of loss causation for its 10B-5 claim. The second ground, it found that Alameda was absolutely immune from the state securities claims. We also have a cross appeal on the – on our right to defense costs. So I would address the loss causation issue first, then go to immunities, and finally to the 1038 issues. Great. Well, let me just jump in. Sure. Because as I've already indicated to your opponent, I don't think that that oracle standard, if that's the shorthand phrase we're going to use, I don't think that can apply in this case, if only because this is not a case in which the fraud was ever publicly disclosed, and it's not a case in which the harm that they're seeking recovery for is any kind of a drop in the price of the security itself. Correct. Okay. So there's got to be some alternative. Yeah. Well, I – yeah. I think Nuveen's appeal in this case is built on a fundamental misunderstanding of what the district court ruled. The district court ruled here not as to that they had to do an event study methodology, as the Court's already recognized. She agreed with Nuveen that they couldn't do that. But she did say, and correctly, that, well, you still have to prove proximate cause, and that's all we're talking about. We're talking about plain old tort, fraud, proximate cause. That's what the court – U.S. Supreme Court said in Dura, and it's what many circuit courts have held. She described it as a causal connection at some point, but nothing – she never said you have to – in order to prove proximate cause, you have to do it this way, this certain methodology. And that's where she found that Nuveen had failed to prove this case, because its only expert, Mr. Sosa, who's barely mentioned in the briefs, was unable to establish that connection. Another thing I think that should be clear is that in this appeal, as Nuveen makes very clear in its reply brief, it is not challenging the sufficiency of the evidence. So, in other words, it's saying, under the loss causation standard Judge Gilson applied here, if that's correct, and we believe it is, we can't win. They say in their reply brief, it's dispositive. If the Oracle standard is applied, they can't win. That's certainly true. Well, no. The Oracle standard, I read, and again, consistent with Dura and many other cases, is simply saying you have to prove proximate cause. You have to prove a causal connection between the fraud that you're alleging and the loss. Let me just tell you the theory that I found persuasive in their reply brief. They analogize this to a fraudulent mortgage loan, let's say. I'm the borrower and I misrepresent to you certain facts with respect to my ability to repay in the future. I think it would be enough from a proximate cause standpoint if I ultimately – if the plaintiff ultimately proves that the reasons, the misrepresentations that were given are what led to the default. Yes. And I think your opponent says that's exactly our case, and we did put on evidence to support that. Well, no, they did not. In fact, that's exactly what Judge Ilson found was that the misrepresentations which related to the subscriber numbers and financial projections, basically unrealistic projections as to what the business could do, were not related, or at least they couldn't prove they were related, to the sale price of the telecom system. No, not to the sale price. Right. Right. Their expert ended up conceding that. I'm talking about the reason for the default. The reason that your clients couldn't ultimately refinance those notes is precisely because the projections didn't materialize. Right? That's correct. However, what the cases require, what Dura requires and all the other cases, is that you have to be able to show a connection between the fraud and your loss. And the loss, according to Nuveen, was the fact that the system sold for $15 million. And we all can recognize that if the system had sold for $33 million, there would have been no loss at all. So their loss was the fact that the market price of the system was only $15 million. And their expert testified. Again, sufficiency of the evidence is not an issue. They're not appealing that. But if you want to get into that, their expert affirmatively testified in deposition that there was no connection. Judge Ilsen quotes that in her order, that I don't, I can't make that connection between the fraud, the alleged fraud in 2004 and the fact that the system sold for $15 million. Let's go back to the mortgage hypothetical, right? Sure. I defraud you into loaning me the money to buy this house. You take the house as security. If you're ultimately, if I ultimately default precisely because of the reasons that I misrepresented to you, right? Yes. I think as the lender, you say, okay, well, I'm stuck now with this house. I've got to go sell it. And whatever shortfall I realize on that, those are my damages. And they're approximately caused by your misrepresentations because that's what caused me to default. No, I think, yeah, I think, I think the cases, however, say that it has to be a direct connection between the fraud and the loss. And the loss is not the fact that the person defaulted or the business wasn't successful, which is what happened here. The loss was the fact that this system sold for $15 million as opposed to $33. It's the retail delta that is the alleged loss, correct? Correct. So it's, you know, it's deflated. So he explained it as this. So maybe you can respond in his terms. He says both his theory and what I understand his expert is, is that they knew it was bad, they knew there would be a default, and therefore it wouldn't be marketed or couldn't be marketed at what previously would have been a fair market value. Yeah. What Nuveen's ---- That's what I think their theory is. So maybe you can respond. Well, no. Their theory on this appeal, again, it's not sufficiency of the evidence. They're not saying that Judge Ilsen reached the wrong conclusion in evaluating Mr. Sosa's testimony in Garfunkel, whatever. They're saying that in these types of cases, the inefficient market cases, this Court should substitute for the requirement of loss causation proof that the notes were, quote, unquote, unmarketable at the time that they were sold back in 2004. And this is known as the fraud created the market theory. It is not loss causation. It's a theory of reliance. It's been rejected. It's never been accepted by the Ninth Circuit. It's been rejected by several circuits, including the Third Circuit. And I think after the Stonebridge case, Supreme Court decision pretty recently, you can consider it's not a viable ---- I'm with you on that. I'm still stuck on my hypo, which you haven't adequately addressed in my view. Because let's say that my misrepresentation to you to get you to loan me the money for the house is that I make, you know, $50,000 a month, when in fact I make $5,000 a month. Correct. You're saying that when the lender goes and forecloses and gets $100,000 less for the house than the loan is worth, right, that somehow they have to prove that the reason they got $100,000 less is because I lied about the amount of income I was making? Well, I think, yeah. I mean, I think that is the loss. You would never be able to do that. You would never be able to do that. And you're saying that in that hypo the bank cannot recover the shortfall from the borrower? Because that's the product of the fraud. Well, except this is securities fraud cases. And there are special rules the courts have established for securities fraud cases. And one is that you have to establish loss causation. You have to establish a link between the specific subject of the alleged fraud and the loss. This is not a real estate case or, you know, but so we have to follow, number one, what the PSLRA teaches us, which says you have to prove loss causation. But Judge Wattsford's hypothetical doesn't require you to go that far. It's loss causation. So it's the fact that you made that misrepresentation, which is the cause of the loss. It induced me to do things I otherwise would not have done. And as a result of having done those things, I suffered a loss, irrespective of whether it's real estate or whether it's securities. I suffered that loss because of your fraudulent inducement. And the OS arguably did that in this case. Yeah, I understand that. But that is that's transaction causation we're talking about. That's reliance. That's not loss causation. Right. Transaction causation is that I never would have entered into this deal had I known the truth. That's a completely different thing. And the court's – the court decision we've cited in our briefs have made it very clear that that's – It's not – no, it's not. Hang on. Okay. Because it's not transaction causation. And let me give you – just go back to my hypothetical, because I'm stuck on this and I just – please move me off it if I'm wrong. But transaction causation would be just simply that I made a misrepresentation. And you relied on it to make the loan. Proximate causation here is that the reason that I misrepresented to you, right, the amount of the income, is ultimately what led to the default. Because if let's say that I lied about my income, but the reason for the default was that I actually got fired. It never even mattered why – how much money I made. I just lost the job altogether. And that's what caused the default. Then I would agree with you. In that situation, proximate cause isn't shown. But they're saying that the misrepresentations that were made at the outset are what led to the default. And if that's wrong, then tell me about that. Right. Well, it is transaction causation, I think, that says that had I not purchased these notes, I would never have sustained a loss. I mean, that's true. But that's transaction causation. So we have to look at the loss. The loss here was the fact that the system sold for $15 million as opposed to $33. We know that if it sold for $33 million, there would have been no loss. And we introduced evidence. Again, we're getting into sufficiency of the evidence, which is not an issue, I believe. But in any event, we introduced evidence that there were all kinds of other factors operating here. The economy had completely bottomed out in 2008. The market for telecom systems had declined from, I think, $3,500 to $4,000 per subscriber to $1,500. We had competition from Comcast that was – Comcast all of a sudden had become this behemoth. One of the problems with the case is everybody says, oh, we're not talking about the evidence. But we are talking about the evidence, because in what I think Judge Watford posits, it really is a transaction causation. It's misrepresentation, default, loss. That's really – as I view it, that's really transaction causation. What you're saying is, is the misrepresentation the proximate cause of the ultimate deflated sale of this asset? And I think that is probably its loss causation, whether it's an efficient or an inefficient market, correct? Correct. So here there's no doubt that this is, you know, not the typical efficient market. Do you think there is a different way it should be constructed where you have an inefficient market in terms of the nature of proof of the loss causation? Yes, and I think some cases have talked about that. You know, clearly you can't use the event study methodology. But I think if you look at – I'm trying to think – I believe it's the Robbins case talks about, well, you really can't generalize. Just like any proximate cause case, it's hard to come up with a test. The Robbins case talked about a case-by-case basis. Nuveen kind of asked that. Well, how are we supposed to prove loss causation if we couldn't do an event study? Well, I don't think Judge Yeltsin or anyone can tell any plaintiff, how do you prove the loss was caused by the fraud? Well, let me posit this. As you could say, well, look, there was some fraud. There was lack of disclosure. There was a default. And now we're stuck with this half of a white elephant basically. I presume they could have shown that it wasn't market economics that caused us to be here, correct? That's correct. Let's just say that the market had sustained itself during this period. Then presumably you could show that that's not the reason that you ended up with this bad deal. Or let's say the consumer pricing or some of these other things had not come into play. So I assume that one way to do it is to take out what would be major factors for the drop, in effect. Yes. Yes. That's what I was talking about, the competition from Comcast, the economic conditions at the time. But what their expert could have done and specifically did not do was he could have said, okay, I've looked at the projections back in 2004, the subscriber numbers. They said their revenues are going to be this. That was really unrealistic for these reasons, whatever. And that directly related to the sale price of the system. Right. Okay? So the reason Alameda only got $15 million for this system as opposed to $33 million was because of those specific representations back in 2004. That's where he fell short. He could not do that. And, in fact, in his deposition, he affirmatively testified that there was no relationship between those supposedly inflated projections and the market price of this system. I just don't think that's what he needed to show. He needed to show that the misrepresentations are tied to the reasons that the default occurred, not for the ultimate price that was realized for the assets. And all the explanations you were giving about, well, the market came down. There was competition from Comcast. If you could show that those are the reasons for the default and they had nothing to do with the inflated projections, then I think you would win. But as I read the record here, there's a fact question as to that issue. Well, first of all, again, Nuveen is not challenging a fact question here. It's saying the district court applied the wrong standard. And I think there's absolutely no support for the standard they're trying to get the court to apply, and that's you don't need to go any farther than that. The fault isn't the loss, correct? Right. Loss causation under the PSLRA and under all the cases say that it has to cause the loss. And it looks at the loss, not default, but a loss. It's got to cause the loss. And, you know, I guess you could say in any of these cases, okay, had I not purchased the security, yeah, I wouldn't have lost money. Or if they hadn't defaulted, I wouldn't have lost money. But the courts look at what is the actual loss here. And Nuveen did not say here that our loss was the fact that the telecom system didn't generate enough revenues to pay us or to refinance. Their loss is because the system sold for $15 million as opposed to $33, and it was unable to sort of pull out of the causative mix here all of the other factors that were obviously affecting the price of telecom systems in 2008 that may or may not have had absolutely nothing to do with the loss, not to mention the fact that the expert affirmatively testified there was no connection. So I think if you apply the law as it's written, first of all, Nuveen's substitute standard has no bearing here and should be outright rejected. And their representation in their reply brief that they're not challenging, that it's dispositive if the district court applied the correct standard, which I believe she did. And even then, we have the affirmative testimony of the expert and Judge Ilson's findings on the fact that the expert couldn't tie the alleged fraud to the loss. I'd like to turn to immunity. Unless the Court has any more questions on that. I think the Court has already asked some of the questions, points I was going to make on immunity. But in California, public entities are absolutely immune for liability based upon representation. Nuveen. That's the tort law, right? I'm sorry? That's the tort law that you're talking about, where they get the absolute immunity. Yes. Yeah. We're talking about California corporate securities law and then 818.8, which immunizes public entities in California for liability. But about 815, counsel spent a lot of time. He conceded that under 818, there was absolute immunity. But under 815, he thought he found some relief. Yeah. That's a point I frankly don't understand, because 815 clearly says, number one, all tort liability in California is by statute. Common law tort liability is abolished. And it also says that there are a bunch of immunities that are going to follow this, and they take precedence. The liabilities are subject. So 815 supports our position. It says it's only by statute and the immunities prevail. That's exactly what we're talking about here. But by statute, he goes to the California securities law. Corporate securities law. And there, when they talk about the corporate securities law and they talk about a person as used in the law, includes a public entity. So what is the meaning of that? I think you can resolve that question, and I think it's the key question here, by simply looking at the Caldwell case. California Supreme Court, very analogous situation. You had an immunity under 820.2 for discretionary acts of the district, school district board members that were involved in that case. And you had a very similar liability provision to the corporate securities law under FEA. And, in fact, you actually had two provisions there, because you had the district board members potentially liable as agents of the employer, but also direct liability as aiders and abettors of the fraud. And the California Supreme Court clearly said you need something more, I think as one of the panelists said, that you've got to have a stronger statement that there has to be a clear indicia of intent in the liability statute to override the immunity section. And you don't have that in FEA. The Court looked at that, and that was, frankly, a stronger statute, I thought, than the corporate securities law. And there's nothing in the corporate securities law that says we're intending this liability to apply to public entities, despite the fact, notwithstanding their immunity. Is it just surplusage, then, in the corporate securities law? Well, no. This is – there are a lot of other provisions in the corporate securities law, as I think we said in our brief, there's like over 200 sections or something, that are outside of these sort of anti-fraud provisions. One fairly obvious one is that the commissioner of corporations has broad authority to enjoin practices, you know, misleading advertising or, you know, all kinds of things in the corporate securities law. And the Claims Act has nothing – involves claims for money or damages, has nothing to do with injunctive relief. So that's one area. Another area in the corporate securities law is that issuers, although municipal issuers don't have to register their securities, but it is unlawful for persons, using that definition again, in the corporate securities law, to deal with unlicensed broker-dealers. There are several prohibitive practices that I think aren't – the definition of, you know, misrepresentation or omission that might not – that might fall outside of the immunity provisions. But I think by following the Caldwell decision, that's the best thing we got. I agree that we – there is no case on point that says that, you know, does 818.8 override the corporate securities law. I was interested to hear about the certification to the California Supreme Court. I don't think that's necessary because of Caldwell, because of the federal analog and its decision of the Ninth Circuit in the Safeway Portland case, and the fact that unlike in Caldwell, we're dealing with an absolute immunity here. This is absolute. There are no exceptions to it. So based on those factors, we also cited the BNY Western case, so I agree that it's not unsighted. But, you know, some indication the court of appeal had it fully briefed and did not grant a petition. But, you know, if we had a case on point going – but I really think with the – If we had a case on point, we wouldn't be here on that subject. Yeah. If you look at the Caldwell case, I think I would be very surprised if the Supreme Court did not say this has been decided by Caldwell. We don't. But, you know, obviously it's – case could be certified. The other argument Nuveen makes on 818.8 is it applies only to misrepresentations by employees, and I think the Court has already hit on the fact that there's no case that says that. If you look at all the cases we cited, the Hirsch case, which it was a certificate of ownership issued by the DMV, the Trinkle case where it was a misleading advertising campaign by the Lottery Commission. So – and in those cases, there's no mention whatsoever of a distinction that the reading that Nuveen wants to put on this, that it applies only – and the Court has already hit upon the legislative committee comment, which doesn't make that distinction. So I think that argument has no support in the law. We did make a motion for attorneys' defense clause under CCP 1038. And I think that's quite well briefed on both sides. Okay. Thank you, Your Honor. We ask that the Court affirm the district court's order on summary judgment and a reverse on the CCP 1038. Thank you. Your Honors, if I may very briefly address Alameda's reliance on Caldwell before getting to the loss causation issues. Caldwell specifically said it was not addressing the issue of direct entity liability. If Alameda is going to contend that the interpretation of FIHA is relevant and persuasive with respect to the interpretation of the California Security Services Act and the TORC claim, then by definition, Dijon requires a finding that Nuveen has stated a cause of action against Alameda that is not subject to the TORC Claim Act immunities. I don't think I really have anything else to say on the immunity side, unless the Court has questions. On the loss causation side, there were some misconceptions I think we need to address. First, Alameda has characterized Nuveen's position as claiming that its loss results in some fashion from a deflated purchase price of the Comcast system. That's not true. Nuveen's loss is the difference between what it paid for the notes and the purchase price of the system. The system was a fraud-free transaction. It's just selling collateral. It's like selling the house when you have a mortgage. Nuveen's belief is that it presented sufficient evidence in the trial court to allow a jury to conclude that these notes never could have been issued if there wasn't fraud. And the proximate cause standard, which is the underlying standard set forth in Dura, says that if Alameda could have foreseen Nuveen's loss, in other words, could have foreseen that Nuveen would have been damaged in the difference between the purchase price and the value of the security, then it's recoverable. Your Honor, I see my time is up. May I just conclude two more points? Sotomayor, Okay. The other issue is that Alameda states this is not a sufficiency of the evidence appeal. That's not necessarily true. The trial court's order states that the trial court looked at this under a drop in price following disclosure standard. That is the only standard the trial court applied. So if there is a different standard that needs to be applied, the trial court needs to be given the opportunity to evaluate Nuveen's evidence in light of that different standard. So in that regard, there is an issue with regard to the sufficiency of the evidence. The final point I will touch on is this concept of transaction cause versus loss causation and how that plays in with proximate cause. Transaction cause is the individual saying, I would not have purchased this if you had not defrauded me. That is a subjective, individualized determination. Loss causation is a more objective determination, which asks, was the loss proximately caused by the wrongful conduct? We've already talked about the evidence that we've produced that we believe allows a jury to conclude that any difference between the collateral value that was realized and the purchase price was a foreseeable consequence of the fraud, because the fraud caused those instruments to be issued. But to the extent that Alameda has arguments that there are additional causes, the proximate cause analysis we are urging the court to adopt accounts for that. Traditional proximate cause analysis recognizes things like superseding or intervening causes. So as Judge, Your Honor, you pointed out, Alameda would have the opportunity to come in and say, no, this was caused by the economy. That was an unforeseeable superseding or intervening cause. The law already exists to handle those. I think the trial court just needs to be given the opportunity to apply that more generalized proximate cause statement. Unless Your Honor has any more questions, I appreciate your time. Thank you. Thank you. Thank both counsel for your very helpful arguments this morning. The case just argued, Naveen Municipal v. City of Alameda is submitted.
judges: Marbley, McKeown, Watford